UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **2:25-CR-20824-TGB-APP** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** |
| **DONNIE SMITH, JR.,** | **(ECF NO. 31)** |
| Defendant. | |

Defendant Donnie Smith moves to suppress evidence seized from his home as well as statements that he made after his arrest. ECF No. 31. On July 31, 2025, Taylor Police officers responded to a call from a mother who reported that her 14-year-old daughter (hereinafter "MV2") went missing from their home overnight. The mother tracked her daughter's cell phone to a house on Joan Street in Taylor, Michigan. Taylor police arrived at that location, announced their presence multiple times by knocking on doors and windows and ringing the doorbell. No one answered. One officer looked through a gap in the broken blinds of the front door window and saw a terrified-looking girl standing in the home's living room. The officer then entered the home through the unlocked front door to escort the child to safety, when he saw a second girl (hereinafter "MV1") on the living room couch. The officer entered the home and arrested Defendant Donnie Smith, Jr. During a later post-

*Miranda* interview, Smith made several admissions about his conduct with MV1. The execution of search warrants and review of Smith's phone revealed that Smith engaged in sexual acts with 13-year-old MV1, recorded those acts, and sent those videos over the internet to a man in Boston.

Smith now moves to suppress all evidence obtained by the police as a result of their warrantless entry into his home, including his iPhone and its contents, and his statements made in the post-*Miranda* interview the following day. He also contends that his statements should be suppressed because the officers allegedly continued the interview after he requested counsel. The Government opposes Smith's motion, asserting that the officers' entry into the home was justified by the need to render emergency assistance to occupants, and that Smith's confession was lawfully obtained in a manner that did not violate his right to counsel. ECF No. 37. The Court held evidentiary hearings on Smith's motion on May 19 and 20, 2026. Counsel for both sides appeared, presented testimony from four law enforcement officers and a public safety officer, and offered oral argument.

For the reasons set forth below, Smith's Motion to Suppress will be **DENIED**.

2

## I.    BACKGROUND

### A. Police Find MV2 and Arrest Smith

On July 31, 2025, a woman contacted the Taylor Police Department about her missing 14-year-old daughter, MV2. MV2's mother stated that when she had woken up that morning, MV2 was gone, along with her blanket. MV2's mother stated that she could track MV2's cell phone, which was pinging to an address on Joan Street, in Taylor, Michigan. Taylor Police Reports, ECF No. 32-1, PageID.112.

Three Taylor Police officers—Corporal David Denlar, Corporal Michael Voelz, and Officer Peter Cherry— were dispatched to the Joan Street address at approximately 10:30 am that day "in an attempt to recover a missing juvenile." *Id.* PageID.111. They arrived at the Joan Street address and Cpl. Voelz met with MV2's mother. She told him what she knew about MV2's disappearance, that MV2's cell phone was still pinging at the Joan Street address, and that she did not know who lived at that address. *Id.* Cpl. Voelz further testified at the hearing that MV2's mother stated that MV2 had a degree of autism and some other medical issues, and that she had not been taking her medication, which caused her to be irritable. Officers observed and confirmed that MV2's phone was currently pinging to that same Joan Street address. *Id.* PageID.112.

At the hearing, Cpl. Denlar and Officer Cherry both testified that they were familiar with the Joan Street house and with Smith, having responded to calls at that residence in the recent past for a drug-related

3

incident and an incident involving stolen property Smith had listed for sale on Facebook Marketplace. The three officers went to the Joan Street home and knocked on both the front door and the front window and announced their presence. The officers also rang the doorbell. No one answered. The officers knocked on the door several more times and loudly announced "Taylor PD" and ordered the occupants to come to the door. Cpl. Denlar looked through a gap in the broken blinds of the front door window and saw a young girl, later determined to be MV2, standing in the living room looking terrified. *Id.* He found the front doorknob unlocked and then opened the door, leaned in, and entered the home to get MV2 out of the house. *Id.* MV2 still looked very frightened, had tears in her eyes, and told Cpl. Denlar she "needed her friend" who didn't live there, gesturing toward the couch in the living room. Cpl. Denlar BWC at 3:45–4:16, ECF No. 37 Exhibit 1. Cpl. Denlar then saw a second girl in the home, later identified as MV1, sitting on the couch. *Id.* Officers later determined that MV1 was 13 years old and was a missing juvenile out of Taylor. ECF No. 32-1, PageID.116. Officer Cherry escorted MV2 to her mother's vehicle. *Id.* PageID.112.

Cpl. Denlar again loudly announced his presence and requested that any additional occupants come to the front of the house. *Id.* PageID.115. The officers knew that Smith was the only listed resident of the home. *Id.* Smith then appeared in the hallway and walked towards Cpl. Denlar and Cpl. Voelz. Cpl. Denlar took Smith into custody based on

active traffic warrants out of the 23rd District Court and handcuffed him. *Id.* PageID.115–16. As he was being arrested, Smith dropped an Apple iPhone onto the floor. *Id.* PageID.112. Cpl. Denlar turned Smith over to Cpl. Voelz so that Cpl. Voelz could secure Smith in the back seat of his patrol car. Officer Cherry returned to the house and he and Cpl. Denlar finished clearing the house to see if there were any more children or adults in the house, and found another man and a woman inside a back bedroom. The officers brought them to the living room where MV1 was sitting. *Id.*

As Officer Cherry stood at the front door threshold of the house, so he could keep watch over MV1 and the other two adults sitting in the living room, a phone on the ground by the door began to ring. Gov't Exhibit 5, Clip of Ofc. Cherry BWC at 0.05–0.28. The two adults told Officer Cherry that the phone belonged to MV2. *Id.* Officer Cherry gave the phone to Cpl. Voelz, who took it to where MV2 and her mother were sitting. However, MV2's mother stated that it wasn't MV2's phone, and that she in fact had possession of MV2's phone. The phone was then shown to Smith as he was sitting in Cpl. Voelz's police vehicle with Sergeant Rissman and Cpl. Denlar standing nearby, and Smith confirmed that it was his phone. Gov't Ex. 6, Cpl. Denlar BWC at 0.03–0.37. Cpl. Denlar then placed the phone in the front seat of the same vehicle, to be kept with Smith as his property. *Id.* 0.37–0.50.

Cpl. Voelz spoke with MV2's mother, who stated that MV1 and MV2 had been friends since elementary school. ECF No. 32-1, PageID.113. MV2's mother stated that she had looked through MV2's phone as they were sitting in her car and found a prior conversation between MV2 and MV1 in which MV1 tells MV2 that they could make money by being part of a "three some." *Id.* MV2 told her mother, in the Cpl. Voelz's presence, that she was picked up between 1:00 am and 2:00 am that morning by a male in a black truck, and that MV1 was in the truck as well. *Id.* Cpl. Voelz pointed to the Dodge Ram pickup truck parked in the driveway of Smith's house and MV2 confirmed that it was the same truck. *Id.* MV2 stated that when the three of them arrived at the Joan Street residence, MV2 saw the man sexually assault MV1 on the couch in the living room. *Id.* The man then touched MV2 in her private areas, exposed his penis to her, and attempted to have sex with her but she refused. *Id.* Based on MV2's description of the man, Cpl. Voelz determined that the man was Smith. *Id.* Cpl. Voelz stated that MV2 was very distraught and crying while she was relaying this information. *Id.*

MV1's legal guardians arrived on the scene and Cpl. Denlar transported MV1 to the hospital to be evaluated. MV2's mother also took MV2 to the same hospital for evaluation. *Id.* Cpl. Voelz transported Smith to the jail at the Taylor police station. *Id.* PageID.114. Once inside the jail, Smith was processed, and Cpl. Voelz collected Smith's clothing and cell phone, placed them in a brown evidence bag, and secured them

in the trunk of his patrol vehicle, before returning to the scene on Joan Street. *Id.*

By that time, Taylor Police detectives (Detectives Zachary Digiacomo, Phillip Wengrowski, Mario Hinojosa, and Detectives Johnston and Oliver (first name unknown)), who had sought and obtained a search warrant for the Joan Street residence, which included the seizure of electronic devices, had arrived on the scene and were executing the search warrant. Taylor Search Warrant, ECF No. 32-2. As the detectives were executing the search warrant, Cpl. Voelz turned over Smith's cell phone to Detective Hinojosa. ECF No. 32-1, PageID.111, 114. Smith's cell phone and MV1's cell phone were later searched pursuant to a federal search warrant. ECF No. 32-3.

### B. Smith is Placed in Jail and Interviewed the Next Day

When the police took Smith to jail, his clothes were collected as evidence, he was given a "Tyvek suit" to wear in their place, and he was placed in a "detox cell." Public Safety Officer ("PSO") Jacob Scott explained at the hearing that the detox cell is the cell closest to the jail's entrance and is used for inmates who are uncooperative or going through drug or alcohol detox or suicidal or with medical issues and who need to be more closely observed, or inmates who need to be kept separated from other inmates. He stated that the water is turned off to the detox cell for the occupant's safety and to prevent inmates from attempting to flood the cell.

At about 6:00 p.m. on July 31, 2025, PSO Scott entered the detox cell because he observed Smith on the cell floor partially hidden behind a half-wall in the cell that blocks off the toilet and the sink. PSO Scott found Smith on his knees with his head in the urine-filled toilet. PSO Scott yelled to Smith but got no response, and he then pulled Smith's head out of the toilet and moved him away from the toilet and onto his side and repeatedly gave Smith a sternum rub to elicit a response. He stated Smith responded each time by attempting to move away or to clasp his hands over his chest, but he would not communicate verbally, other than to mumble "just kill me." PSO Scott called for assistance from the Taylor Fire Department. When the paramedics arrived, they moved Smith to a sitting position to see if he could control his bodily functions. He was able to remain sitting but he would not walk to the gurney, so he was carried to the gurney and then transported to the hospital for examination. PSO Scott's shift was ending, and he informed his replacement that Smith would need to be placed in a suicide prevention gown when he returned to the jail, per jail policy that requires an inmate be placed in the gown for any suicidal attempts or statements.

Smith was returned to the jail a few hours later, where he was placed in a suicide prevention gown for the rest of the night. Smith later told the police that he "was playing a game" and that he put his head in the toilet to "fak[e] drowning" and "killing [him]self." Smith Interview, ECF No. 31-5 at 1:40:17–1:40:40, 2:08;33.

The next day, August 1, 2025, two Taylor police detectives, Philip Collup and Phillip Wengrowski, interviewed Smith at around 11:00 a.m. Smith was still wearing the suicide prevention gown. The detectives confirmed that Smith had a high school education, was sober, was "physically okay to talk," and could read English. Smith Interview, ECF No. 31-5 at 9:05–9:51. When asked by the detectives, Smith stated he didn't need food or water but did need to use the bathroom, so the detectives took him. *Id.* at 9:26, 9:50.

When Smith and the detectives returned to the interview room, the detectives presented him with a printed copy of his *Miranda* rights and had him initial each right to show he understood it. *Id.* at 12:00–12:16. Detective Collup began to read the *Miranda* rights out loud to Smith. *Id.* at 12:39. As Smith was initialing the first two rights he asked, "Do I need to have an attorney here?" *Id.* at 12:58.[1] The detective responded "Well, that's up to you, these are your *Miranda* rights so we'll go over 'em and then you can make that decision." *Id.* at 13:00. The detective then again read Smith his *Miranda* rights, pausing after stating "You have the right

---

[1]    The government provided an AI-generated transcript of this interview to the defense, which has also been provided to the Court. This transcript was not reviewed or verified by a court reporter but was provided for convenience in following the audio recording. The Court also reviewed the audio recording of the interview. The transcript records Smith as saying "But I need to have an attorney here." ECF No. 32-5, PageID.162. This is not correct, however, because in the audio recording it is clear that Smith asked the question, "Do I need to have an attorney here?"

to have an attorney or a lawyer present before you answer any questions or make a statement at this time" to clarify if Smith understood this right. *Id.* at 13:05–13:35. Smith answered that he did and said, "this is where I need, um—" and then said "I—maybe I should have an attorney." *Id.* at 13:33–13:38. The second detective responded "Okay. It's completely up to you." *Id.* at 13:40. Smith then said, "I mean, I'm not trying to make everything hard, but I'm gonna tell you the truth anyway." *Id.* at 13:41–13:45. "Well, yeah," Detective Collup responded, "we're just going through the rights that we gotta get through 'em, and then you can make that determination." *Id.* at 13:45–13:54. Smith then said to himself as he initialed the right, "Okay, so I have the right for an attorney. I'm gonna take that right." *Id.* at 13:55–14:00. Detective Collup said "Okay," and then finished reading the *Miranda* rights and asked Smith, again, to initial showing that he understood everything. *Id.* at 14:00–14:33.

Once Smith finished the form, the detectives asked follow-up questions to determine whether Smith had been asking to stop the interview and invoke his right to counsel. "Looks like you got hung up on, uh, number three," Detective Collup said: "And you said something about you think I need a lawyer." *Id.* at 15:04–15:12. Smith questioned what his charges were. *Id.* at 15:12–15:17. Detective Wengrowski explained that detectives don't make ultimate charging decisions and said: "So if you'd like to discuss the investigation, we can do that now. If you want a lawyer, you can talk to him first, and then we can talk later. It's up to

10

you." *Id.* at 15:23–15:41. After another exchange about charging, the Detective Wengrowski again emphasized: "I can't talk to you if you want a lawyer. So it's up to you." *Id.* at 15:48–15:53. Smith responded: "Okay, let's talk." *Id.* at 15:54.

The interview proceeded from there, where Smith admitted he had sex with MV1—though he insisted that at the time he believed she was 19—and volunteered that he had a phone recording of the act. *Id.* at 19:30–27:10. Smith also emphasized that he was telling the truth to detectives, saying: "I would have an attorney here if I was worried about anything." *Id.* at 27:54–28:11.

As the detectives probed whether Smith knew MV1 was 13 when he had intercourse with her and when he had sex with her, he told them to "go get [his] phone" so he could show them the video timestamps as to when they had sex. *Id.* at 32:55–32:57. The detectives brought the phone back and looked through it with Smith. They found that Smith himself had recorded some sex acts with MV1 with his phone and had sold that video to another person for $100. *Id.* at 42:30–43:15. Looking through Smith's earlier messages with that person, detectives found that before recording and selling the video, Smith had sent a picture of MV1 to that other person with the message: "I gotta good one for you tonight[.] A 14-year-old runaway." *Id.* at 47:33–47:58. Smith claimed in the interview that this was a mistype, that he didn't know he'd sent that message, that he'd accidentally hit the "4" instead of "9," that he'd seen the mistake and

11

corrected it, and eventually that it was really a voice-to-text transcription error because the TV had been on so loud. *Id.* at 47:42–48:00; 1:33:30–134:10. Smith then stated, "This is why I wanted a lawyer—because you guys are gonna try to mindfuck me into saying something." *Id.* at 49:55–50:00. Detective Collup responded, "No, you said you wanted to talk and let's have a conversation and talk." *Id.* at 50:00–50:02. Smith conceded "Yeah, and I said that," nodding his head. *Id.* at 50:02–50:03. Detective Wengrowski confirmed. *Id.*

The interview continued with discussion of the allegations surrounding MV1 And MV2. Near the end of the interview, Detective Wengrowski told Smith it still looked like he was lying. Smith responded: "I'll say this to end it—I admit to it all." *Id.* at 2:19:14–2:20:36. Detective Wengrowski again clarified that Smith admitted to "everything," and Smith affirmed several times. *See id.* 2:20:36–2:23:54 (saying "I even showed you the videos. Who does that? … Who persecutes theirselves more than showing the video?"). But then a few minutes later Smith recanted and tried to seemingly bribe the detectives to get him a pair of socks and different clothes by saying he might "have a different outlook" and "add in something [he] forgot to add in." *Id.* at 2:40:45–2:41:48.

A break in the interview occurred when Detective Collup stepped out and then returned to ask Smith: "Do you have an attorney, one that you know of? Do you know a Gizicki? …Well, he called over here as your representative, and he is saying that he does not want you to talk

12

anymore." *Id*. at 2:48:15–2:48:38. Smith asked to talk to him, and they discussed when that could happen. *Id*. at 2:49:00–2:49:33. Both detectives repeatedly told him that continuing the interview was up to him, saying "whatever you want do." *Id*. at 2:49:50–2:49:57. A few minutes later, without more substance being discussed, the interview ended.

### C. Forensic Examination of Smith's Phone

Also on August 1, 2025, Taylor Police contacted the Department of Homeland Security, Homeland Security Investigations ("HSI") Detroit, for help with the investigation. On August 4, 2025, HSI Detroit received a blue Apple iPhone with a black case (MV1's phone), and a white Apple iPhone with a clear case (Smith's phone). HSI agents obtained a federal search warrant for both phones, and a forensic extraction was performed of both phones. See Gov't Ex. 3, ECF No. 38-1. The Government states that HSI agents found several videos in the extraction of Smith's phone showing Smith engaged in sexually explicit acts with MV1, with the videos appearing to have been created several days prior to July 31, 2025. Agents also saw conversations between Smith and MV1 between July 24, 2025, and July 31, 2025; and they found a WhatsApp conversation between Smith and a contact named "Ryan" in which Smith sent the sexually explicit videos of MV1 to "Ryan" for $100.

13

**D. Smith is Charged with Sexual Exploitation of Children**

On August 25, 2025, Smith was charged in a federal criminal complaint with sexually exploiting children. ECF No. 1. On November 4, 2025, a federal grand jury returned an indictment charging Smith with the sexual exploitation of children, in violation of 18 U.S.C. § 2251(a), and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5). ECF No. 18.

On January 23, 2026, Smith filed the instant Motion to Suppress. ECF No. 31. Smith argues that the Taylor Police officers' entry into his home without a warrant was presumptively unreasonable and a violation of the Fourth Amendment, and that all fruits of the violation, including Smith's cell phone, its forensic examination, and his interrogation, should be suppressed. He also argues that his statements during the interrogation at the Taylor Police Department should be suppressed because they were elicited in violation of his Fifth Amendment right to counsel, and that any claimed waiver of that right was neither knowing nor voluntary.

The Government argues in response that the police officers' initial entry into Smith's residence was justified by the exigency of the situation, including the reasonably perceived need to render aid to people in the house, the danger to the public and police, and the need to prevent Smith from fleeing. The Government contends that Smith's phone was picked up while he was at the scene and sitting in a police car and kept in that

vehicle with Smith as his property, and not collected at that time as evidence. Police subsequently obtained a search warrant for Smith's house, to include electronic devices, at which time the phone was given to detectives to be seized as evidence. The Government further argues that the detectives' interview of Smith was lawful because he never definitively invoked his right to an attorney and, in fact, waived that right.

## II.    LEGAL STANDARD

A defendant may assert a violation of the Fourth or Fifth Amendment and seek suppression of evidence by filing a pretrial motion. *See* Fed. R. Crim. P. 12(b)(3)(C). The burden is on the defendant to show "'a violation of some constitutional or statutory right justifying suppression.'" *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n. 11 (6th Cir. 1979)). "The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (*citing Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

In moving for suppression of evidence, the defendant bears "the burdens of production and persuasion." *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998). Specifically, the defendant must demonstrate

15

that the government violated his constitutional rights in conducting a search or seizure or interrogation. *See Rodriguez–Suazo*, 346 F.3d at 643. The standard of proof is preponderance of the evidence. Once a defendant meets their burden, it shifts to the United States. Ultimately, the government bears the burden to show by a preponderance of the evidence that its search or seizure or interrogation were reasonable. *See United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015); *United States v. Vining*, 675 F. Supp. 3d 778, 785 (E.D. Mich. 2023) (Berg, J.).

## III.   DISCUSSION

### A. Exigent Circumstances

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The purpose of the Fourth Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (quoting *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528 (1967)). "[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)).

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

16

However, "[t]he warrant requirement is subject to certain exceptions." *Lange v. California*, 594 U.S. 295, 301 (2021). Among those is where "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (citation modified). "Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant." *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010). The Sixth Circuit has "repeatedly recognized" that exigent circumstances include: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *Id.* (citation modified). And, as the Supreme Court recently reaffirmed, another recognized exigency obviating the needs of a warrant is when officers have an objectively reasonable basis for believing that an occupant faces serious danger and needs emergency aid. *Case v. Montana*, 607 U.S. 107, 113 (2026) (reaffirming *Brigham City*, 547 U.S. at 400); *see also Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (acknowledging that officers may enter a home to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury.").

The emergency aid exception does not require "ironclad proof of a serious, life-threatening injury," and officers are not required to "wait for a potentially dangerous situation to escalate into public violence in order

to intervene." *Johnson*, 617 F.3d at 868 (citation omitted). However, there must be evidence showing the officers had an "objectively reasonable belief, given the information available at the time of entry, that a person within the house was 'in need of immediate aid'" to justify the warrantless entry. *Id.* (citations omitted); *see also Brigham City*, 547 U.S. at 406. "The objective reasonableness of an officer's conduct … is evaluated by looking at the 'totality of the circumstances.'" *Case*, 607 U.S. at 118 (citations omitted). The Supreme Court recently explained that this standard does not mean that officers must have "probable cause" for the intrusion, "as they typically would when investigating crime," stating that "*Brigham City's* reasonableness standard means just what it says, with no further gloss." *Id.* at 109.

To determine whether there were sufficient exigent circumstances to excuse the officers' warrantless entry into Smith's house, the Court must consider the specific information that was available to the officers at the time of entry. In this case, the Taylor police officers were dispatched to Smith's home after MV2's mother called and reported that her 14-year-old daughter went missing, along with her blanket, in the middle of the night and that her cell phone was pinging at a strange home that the mother did not know. MV2's mother relayed to the officers that her daughter has a degree of autism and had not taken her medication the night before. The officers confirmed that the child's cell phone was still pinging at the Joan Street residence, strongly suggesting the MV2

18

was inside the house. The officers announced their presence and loudly knocked repeatedly on the front door, rang the doorbell, and knocked on the windows, but no one responded. They also observed a truck in the home's driveway, which made it appear likely that someone was home. Cpl. Denlar looked through a broken slat in the blinds behind the front door's window and saw a frightened-looking girl matching MV2's description. He described her as "terrified." She was frozen in place and not coming to the door. He therefore had an objectively reasonable basis to open the unlocked door and enter the home to render aid to the child. And the evidence in support of this objectively reasonable basis for entering the home increased when MV2 emerged from the house scared, upset, and tearfully reporting that her friend was still inside the house. She said she didn't want to leave without her friend, MV1, who was sitting on the living room couch.

Considering the totality of the circumstances and all of the information known to the officers at the time they entered Smith's home, the Court finds that the officers' warrantless entry was justified by the emergency aid exception to the Fourth Amendment. Numerous courts reached the same conclusion on similar facts. *See, e.g., United States v. Clayton*, No. 18-524, 2020 WL 3034826, at *5 (E.D. Pa. June 4, 2020) (collecting cases holding that "the potential sexual exploitation of a minor is an exigent circumstance."); *United States v. Shingles*, No. 3:15-CR-45-J-34MCR, 2015 WL 5895457, at *14 (M.D. Fla. Oct. 6, 2015) (collecting

19

cases that the potential need to assist a minor at risk for sexual exploitation provides an additional exigency to enter a dwelling); *see also Hunsberger v. Wood*, 570 F.3d 546, 555 (4th Cir. 2009) ("The fact that the girl was not answering her cellphone suggested the possibility that she was hurt or otherwise in need of assistance. When a child goes missing, time is of the essence.").[2] The exigent circumstances exception "applies regardless of whether the minor's involvement is involuntary[] or voluntary." *Clayton*, 2020 WL 3034826, at *5 (quoting *United States v. King*, 560 F. Supp. 2d 906, 916 (N.D. Cal. 2008)). "A minor's apparent consent to being the victim of a sex crime does not negate the necessity of an urgent response by law enforcement." *Id.*

---

[2] In his motion, Smith cites to *United States v. Gordon*, 339 F. Supp. 3d 647 (E.D. Mich. 2018), in support of his request for suppression. In *Gordon*, a case decided by this Court, exigent circumstances did not justify the warrantless entry into the motel room of a man who had a 16-year-old girl inside the room and was likely engaged in sex acts with her. In that case, the Court noted that the age of consent in Michigan was 16, so the possibility of sexual conduct alone did not support probable cause that a crime was being committed. Moreover, the testimony presented by the officers in *Gordon* did not corroborate the government's position that the officers had heard sounds or rustling in the room, or noises suggesting destruction of evidence, escape of the suspect, or immediate danger or harm to the child. *Id.* at 658–59. There was insufficient evidence in that case supporting a reasonable conclusion that a person was in danger. Here, before entering the home, according to the officers' reports, their body worn cameras, and their testimony at the evidentiary hearing, Cpl. Denlar looked through the blinds and could see MV2, a minor child, who appeared terrified and unable to come to the door.

Further, the evidence and the testimony at the evidentiary hearing demonstrates that the collection of Smith's cell phone, which he dropped near the front door of his house as he was being arrested, was done pursuant to an administrative purpose to keep Smith's property with him; it was not seized at that time to collect it as evidence. Officer Cherry, who was not present when Smith was arrested, discovered the phone at the front door threshold when it started ringing. The occupants of the house stated that the phone belonged to MV2. After MV2's mother confirmed that the phone was not MV2's, the phone was shown to Smith who confirmed it was his phone. The phone was then placed in the same vehicle Smith was held in, to be transported with him as his property. This was not a warrantless seizure of the cell phone as evidence to investigate a crime, but instead was collection pursuant to an administrative purpose to protect Smith's property, akin to inventory searches conducted upon an individual's arrest. *See United States v. O'Neil*, 62 F.4th 1281, 1292 (10th Cir. 2023) ("Inventory searches are not treated as investigative searches because they serve three administrative purposes: the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger.") (citation modified). Officers later sought and obtained a search warrant for the Joan Street house that included electronic devices, and the phone was given to detectives to be seized as evidence at that time.

Smith also gave his consent for the detectives to search his phone during his interrogation the following day, and a subsequent federal search warrant provided authority for a search of that phone.

Accordingly, Smith's motion to suppress the evidence seized by the police after their entry into Smith's residence, and their subsequent search warrant executed at that residence, will be denied, and the relevant evidence uncovered in that entry and subsequent search will not be suppressed.

### B. Fifth Amendment Claim

Smith argues that his August 1, 2025 police interrogation should be suppressed because he contends that he had invoked his Fifth Amendment right to counsel.

### 1. Invocation of right to counsel

The Fifth Amendment protects an individual's right not to "be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court set forth certain safeguards that must be afforded to criminal suspects. These safeguards include the right to consult with an attorney before speaking to law enforcement officials and to have an attorney present during a custodial interrogation. *Id.* at 469–73. These rights must be explained to a suspect before the questioning begins "to insure that the individual knows he is free to exercise the privilege at that point in time." *Id.* at 469. In *Edwards v. Arizona,* the Supreme Court

further emphasized that "having expressed his desire to deal with the police only through counsel," a suspect must not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication." 451 U.S. 477, 484–85 (1981).

An invocation of the right to counsel must be clear, unambiguous, and unequivocal before an interrogation must end. *Davis v. United States*, 512 U.S. 452, 459 (1994); *see also Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010). "The Supreme Court in *Davis* set a high bar to trigger *Edwards*." *United States v. Potter*, 927 F.3d 446, 450 (6th Cir. 2019). The Sixth Circuit has held that "a suspect must assert his right to remain silent with sufficient clarity that a reasonable officer would perceive it as such under the circumstances." *Franklin v. Bradshaw*, 545 F.3d 409, 414 (6th Cir. 2008). A "reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel" does not require police to cease their questioning. *Davis*, 512 U.S. at 459 (emphasis in original) (holding that "Maybe I should talk to a lawyer" is not an unequivocal request for counsel). Thus, "[s]imply mentioning the prospect of talking with an attorney, or waiting to talk until one is present, is not sufficient," and neither is "[s]tating that 'I'm going to wait' and asking, 'is there a lawyer on board.'" *United States v. Amawi*, 695 F.3d 457, 485 (6th Cir. 2012). Conversely, statements such as that the

23

suspect wanted to be left alone "until I can see my attorney," or directing the police to "call his attorney's phone number," or "maybe I should talk to an attorney by the name of William Evans" have been found to be unambiguous requests that should cause questioning to cease. *See Potter*, 927 F.3d at 451 (citations omitted).

The Government does not dispute that Smith referenced lawyers several times in his interrogation, but contends that none of these references, understood in context, was a clear and unambiguous invocation of his right to counsel. ECF No. 37, PageID.320. Smith first asked, as the detectives were reading the *Miranda* rights to him, "do I need to have an attorney here?" That is a question, not a clear, unambiguous request for counsel. *See United States v. Delaney*, 443 F. App'x 122, 130 (6th Cir. 2011) (holding that defendant's comment—"I think I should talk to a lawyer, what do you think?"— was not an unambiguous request for counsel).

While the detectives were going through his *Miranda* rights with him, Smith commented "Okay, so I have the right for an attorney. I'm gonna take that right." Smith doesn't directly address this statement in his motion or in his reply brief. The Government argues that this statement, in context with Smith's other statements and his conduct during the interview, "reflects a desire for potential *future* counsel only." ECF No. 37, PageID.321 (emphasis in original). After this statement, the detectives finished reading the *Miranda* rights to Smith, asking him to

24

initial showing that he understood everything. They did not ask him any substantive questions. Once he finished signing the form, the detectives then asked follow-up questions to determine whether Smith had been asking to stop the interview and invoke his right to counsel. The detective pointed out that it looked like Smith "got hung up on number three," and that he "said something about [he] think[s] he need[s] a lawyer." The detectives then explained to Smith that if he wanted a lawyer he can talk to the lawyer first, that they cannot talk to him if he wants a lawyer, and that it was up to him, to which Smith responded "Okay, let's talk." The Government argues that this clarification was reasonable given Smith's earlier equivocal statements followed by the clearer statement.

Taken in isolation, Smith's statement while reviewing his *Miranda* rights that "Okay, so I have the right for an attorney. I'm gonna take that right" could be considered an unambiguous invocation of his right to counsel. But the statement cannot be taken in isolation; it must be considered in light of the totality of the circumstances of the interview. Those circumstances included Smith's questioning as to whether he wanted an attorney, stating that he did not want to be difficult, and asserting that he was going to tell the truth anyway. In that context, Smith's statement—seemingly to himself—as the detectives were going through his *Miranda* rights that "I'm gonna take that right" [for an attorney], without any break or pause, as he initialed the right and waited for the rest of the rights to be read to him, is somewhat equivocal

and more reasonably appears to be an expression of his future intent to invoke the right. *See Davis*, 512 U.S. at 459 (a "reference to an attorney that is ambiguous or equivocal in that a reasonable officer *in light of the circumstances* would have understood only that the suspect *might* be invoking the right to counsel" does not require police to cease their questioning) (first emphasis added); *United States v. Carillo*, 660 F.3d 914, 923 (5th Cir. 2011) (defendant's statement that "I just man, I'm not gonna lie to you I wish I had a lawyer right here knowing that you know it's gonna I mean I'm gonna work with y'all I'm telling you I'm gonna tell you everything" was "ambiguous at best" as it "certainly expressed [defendant's] *preference* to have an attorney at present" but that the defendant kept talking indicated his desire not end the interview by invoking his right not to be questioned without an attorney present).

The Sixth Circuit's decision in *Cornelison v. Motley*, 395 F. App'x 268 (6th Cir. 2010) is helpful to this case. The defendant in *Cornelius* was read his *Miranda* rights and then asked, "What if I want my lawyer present first?" *Id.* at 274. The police responded that the decision was up to him and then continued explaining the waiver of rights form. *Id.* The defendant then "signed the form *while* stating that he would like a request for a lawyer 'on the record.'" *Id.* (emphasis in original). The detective then sought to clarify whether the defendant wanted his lawyer present, and the defendant completed the form and laid down his pen. *Id.* The detective asked whether the defendant wanted to talk to the police,

to which he nodded his head affirmatively and responded, "Yes." *Id.* The Sixth Circuit found the Kentucky Supreme Court's conclusion that the defendant's request for counsel was ambiguous and insufficient to stop the interrogation was reasonable. *Id.* The court stated that "[b]oth the 'events preceding the request' and the 'nuances inherent in the request itself' show that Cornelison's request was ambiguous and equivocal." *Id.* at 275 (citing *Smith v. Illinois*, 469 U.S. 91, 99–100 (1984) (recognizing "the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself")). The *Cornelison* court further noted that "[t]he police did not attempt to 'wear down [Cornelison] and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.'" *Id.* (citing *Smith*, 469 U.S. at 98).

Similarly, in this case, given Smith's conduct as his *Miranda* rights were read to him and his questions up to that point of the interview, the detective's follow-up clarifying questions after his rights were read to him was "good police practice." *See Davis*, 512 U.S. at 461 (stating that it is "good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney"); *Machacek v. Hofbrauer*, 213 F.3d 947, 953 (6th Cir. 2000) (detectives' properly asked clarifying questions after defendant said "[w]e're going to have to get a lawyer then and should his mother be notified?"). The Sixth Circuit has stated that "if

27

a questioning officer is reasonably unsure as to whether the suspect wants a lawyer, to require that questioning immediately stop would impermissibly 'transform the *Miranda* safeguards' into 'irrational obstacles to legitimate police investigative activity.'" *England v. Hart*, 970 F.3d 698, 708 (6th Cir. 2020) (citing *Michigan v. Mosley*, 423 U.S. 96, 102 (1975)).

In *United States v. Levya*, No. 16-cr-20723, 2017 WL 4675363 (E.D. Mich. Oct. 18, 2017) (Goldsmith, J.), *aff'd*, No. 18-2440, 2020 WL 2614617 (6th Cir. Jan. 9, 2020), during the defendant's interview, the special agent asked, "Are you saying you would like to have a lawyer present?" to which the defendant responded "Mm-hmm." *Id*. at *9. The court found, after reviewing the video tape of the interrogation, that the defendant did not make an unambiguous demand for a lawyer at that point. *Id*. The Court found that the defendant's response of "Mm-hmm" "appear[s] to be a confirmation that she wants a lawyer, but not that she wants one immediately and that she wanted to cut off the interrogation." *Id*. The court explained that "[i]n context, it was not unreasonable for [the special agent] to continue to explain that [the defendant] could continue to talk to law enforcement or get a lawyer immediately, but not both." *Id*. After further clarification that it was the defendant's call as to whether to continue the interrogation, she chose to continue. So too in this case, the detective took the time to clarify Smith's intentions regarding his *Miranda* rights. After twice telling Smith that he could talk to a lawyer

first and to the detectives later, and then that if he wanted to talk to a lawyer, they would have to stop the interview, Smith affirmatively chose to continue the interrogation, affirmatively stating "[o]kay, let's talk."[3]

Smith cites to *Kyger v. Carlton*, 146 F.3d 374 (6th Cir. 1998), in support of his contention that he unambiguously invoked his right to counsel. In *Kyger*, the Sixth Circuit held that a defendant's statement that he would "just as soon have an attorney" was a clear request for counsel, and that the continuation of questioning after that statement was a violation of the defendant's rights. *Id*. at 379. That court went on to state that, to the extent the defendant's statement was equivocal, the subsequent statement by the police that "Now, if you've got something to hide, I can understand you not wanting to sign that. If you ain't got nothing to hide, you know, you can answer our questions" was "an inappropriate effort at pressuring [defendant] to answer, rather than an appropriate attempt to get [defendant] to clarify his response." *Id*. Unlike in this case, there is no indication that Kyger waffled or asked questions

---

[3] Detective Collup said: "Looks like you got hung up on, uh, number three, and you said something about you think I need a lawyer." ECF No. 31-5, at 15:04–15:12. Smith questioned what his charges were. *Id*. at 15:12–15:17. Detective Wengrowski explained that detectives don't make ultimate charging decisions and said: "So if you'd like to discuss the investigation, we can do that now. If you want a lawyer, you can talk to him first, and then we can talk later. It's up to you." *Id*. at 15:23–15:41. After another exchange about charging, the Detective Wengrowski again emphasized: "I can't talk to you if you want a lawyer. So it's up to you." *Id*. at 15:48–15:53. Smith responded: "Okay, let's talk." *Id*. at 15:54.

as to whether he wanted to invoke his right to counsel. And unlike in *Kyger*, in this case the detectives did not make any similar inappropriate comments to pressure Smith to talk, but rather engaged in appropriate efforts to clarify Smith's earlier equivocal response, after which Smith affirmatively stated, "let's talk," which brought the discussion regarding counsel to an unambiguous conclusion.

Smith's exclamation later in the interview that "This is why I wanted a lawyer—because you guys are gonna try to mindfuck me into saying something," was not a clear and unambiguous request to invoke his right to counsel requiring the detectives to cease questioning. This statement is similar to one the Sixth Circuit found to be ambiguous in *Perreault v. Smith*, 874 F.3d 516 (6th Cir. 2017). In that case,

> During Perreault's police interview, the examining officer said that his story was inconsistent, calling it "jacked up." Perreault responded, "Well, then let's call the lawyer then 'cause I gave what I could." The officer noted, "That's fine," before Perreault added, "There's no reason for anybody to take me to jail." The officer responded, "You getting a lawyer's not going to prevent you from going to jail," after which Perreault continued talking to the officer.

*Id.* at 520. The Sixth Circuit stated that a reasonable police officer could interpret the "Well, then let's call the lawyer then 'cause I gave you what I could" as perhaps a negotiation tactic but not an unambiguous request for counsel. *Id.* at 520–21. Similarly, Smith's offhand reference to "[t]his is why I wanted an attorney" is not an unequivocal request for counsel.

30

"The mere mention of an attorney does not cut it." *Potter*, 927 F.3d at 451. (citing *Davis*).

The Court therefore finds that Smith did not unambiguously invoke his right to counsel during his August 1, 2025 interrogation.

### 2. Knowing and voluntary waiver

The Government asserts that Smith knowingly and voluntarily waived his right to counsel when he said "Okay, let's talk." ECF No. 37, PageID.324. Smith contends that his "let's talk" statement was not a voluntary, unambiguous waiver because of the circumstances of his detention, including being found with his head in the toilet the night before and the length (almost three hours) of the interrogation. ECF No. 31, PageID.98–99.

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived *[Miranda]* rights' when making the statement." *Berghuis*, 560 U.S. at 382. Under this inquiry, the court "examine[s] 'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). The Supreme Court has explained that the relevant question is not whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth

31

Amendment privilege," but rather whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring,* 479 U.S. 564, 574 (1987).

Smith's conduct before and during the interrogation demonstrates that he understood his *Miranda* rights and the consequences of waiving those rights. The officers confirmed that Smith reads and understands English, he was given a copy of his *Miranda* rights and time to review those rights, which constitutes "more than enough evidence" to conclude that Smith understood his rights. *See Berghuis,* 560 U.S. at 385–86; *Garner,* 557 F.3d at 261. Smith signed and dated the *Miranda* rights form after being fully advised of those rights, and contemporaneous evidence during the course of the interview indicates that Smith appeared lucid, clear, coherent, and capable of asking and answering pertinent questions. Also, there is no evidence presented that there was any element of coercion by the detectives during the interrogation. "The fact that some might find [Smith's] decision [to waive his *Miranda* rights] illogical, is irrelevant" because the courts "have never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their consequences.'" *Connecticut v. Barrett,* 479 U.S. 523, 530 (1987) (citation omitted). Smith reiterated his decision to proceed without counsel when he stated during the interview "I would have an attorney here if I was worried about anything." ECF No. 31-5 at 27:54–28:11.

And Smith's conduct and alleged mental status the night before his interview do not render his statements involuntary. PSO Scott testified at the evidentiary hearing that Smith responded to physical and verbal stimuli after being found with his head in the toilet and that Smith did not show signs of having suffered a seizure. Smith in fact admitted during the interview that he "faked" the suicide attempt to annoy an officer in the jail. Moreover, the Sixth Circuit has stated that a defendant's arguments that his statements were not "voluntary" in light of suicidal tendencies, "is squarely foreclosed by Supreme Court precedent." *United States v. Cody*, 498 F.3d 582, 588 (6th Cir. 2007) (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986) (declining to hold that "a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'")). Smith points to nothing the interviewing detectives did that coerced him in any way.

The Court therefore finds that Smith knowingly and voluntarily waived his *Miranda* rights.

## IV.   CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress, ECF No. 31, is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 15, 2026          /s/Terrence G. Berg
                             HON. TERRENCE G. BERG
                             UNITED STATES DISTRICT JUDGE